## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| BRANDY D. WEST, | ) | CASE NO. 3:24-CV-01209-JRK |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP, II |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | CARMEN E. HENDERSON |
| | ) | |
| Defendant, | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I. Introduction

Plaintiff, Brandy West ("West" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

## II. Procedural History

On June 17, 2022, West filed applications for DIB and SSI, alleging a disability onset date of June 1, 2022. (ECF No. 7, PageID #: 301, 304, 306). The applications were denied initially and upon reconsideration, and West requested a hearing before an administrative law judge ("ALJ").  (ECF No. 7, PageID #: 190).  On July 25, 2023, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified.  (ECF No. 7, PageID #: 61, 88, 101).  On, October 3, 2023 the ALJ issued a written decision finding West

1

was not disabled. (ECF No. 7, PageID #: 76). The ALJ's decision became final on May 17, 2024, when the Appeals Council declined further review. (ECF No. 7, PageID #: 28–30).

On July 17, 2024, West filed her Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 8, 10). West asserts the following assignment of error: "the ALJ violated 20 C.F.R. § 404.1520c during the evaluation of the consultative examiner's opinions." (ECF No. 8 at 8). Specifically, West argues that the ALJ failed to adequately address the supportability and consistency of the opinion belonging to Ms. Wheatley, a Certified Nurse Practitioner hired by the Social Security Administration to examine West, and, thus, that she failed to meet the requirements for evaluating medical opinions and prior administrative medical findings under 20 C.F.R. § 404.1520c. (ECF No. 8 at 8–10). West asserts that because of this failure, the ALJ's decision is not supported by substantial evidence. (ECF No. 8 at 13).

## III. Background

### A. Relevant Hearing Testimony

At her July 25, 2023 hearing, West testified that she suffered from seizures and last had a seizure in June of 2023, while she was at work. (ECF No. 7, PageID #: 96–97). She testified that she previously suffered from seizures everyday but explained that her medication had helped, and her seizures occurred less often since she became "used to the medication." (ECF No. 7, PageID #: 96–97). The ALJ asked West's attorney, Mr. Niper, if there was an abnormal EEG in the record, to which he replied that there was not. (ECF No. 7, PageID #: 96). West additionally testified that she was having difficulty seeing out of her left eye but said she had not been to an ophthalmologist and did not know the source of her poor vision. (ECF No. 7, PageID #: 97–98). She testified that she suspected her left eye problems may have arisen as a side effect of her

medication or because of her frequent falling/seizure episodes. (ECF No. 7, PageID #: 97–98).

West also explained that when she worked as a stocker or forklift operator, she would at times lift objects that weighed over fifty pounds. (ECF No. 7, PageID #: 95).

## B. Relevant Medical Evidence

The ALJ summarized West's health records and symptoms:

> The claimant's first seizure was reportedly in January 2022, though she did not go to the emergency department at that time (4F/1). The claimant was not on any medications until March 11, 2022, when the claimant started taking Keppra, 500 milligrams a day, twice a day (1F/7). The claimant also alleged having a loss of sense of smell and taste, which have made it a challenge for her to meet her caloric needs (1F/7).
>
> With respect to her symptoms, the claimant reported that she was unable to work due to her seizure disorder. The claimant alleges having daily headaches and seizure episodes several times a week (4F/1). The claimant is purportedly paranoid to go out in public due to seizures and she no longer drives (4F/1). The claimant needs someone at home while she showers and bathes in case[] of seizures and injury (4F/1). The claimant also cannot be around flickering lights (4F/1).
>
> . . .
>
> On March 15, 2022, the claimant had 2-3 generalized tonic-clonic seizures in the workplace. Rather than rely upon her primary care provider, the claimant followed up with Supriya Mahajan, M.D., Steven Benedict, M.D., and Nicole Danner, D.O., who are all neurologists (1F, 6F, 8F, and 10F). The claimant has epilepsy (1F and 6F). Her seizures have been managed with medications including Keppra, Topamax, Vimpat (lacosamide), and (6F) [sic].
>
> The positive objective clinical and diagnostic findings since the alleged onset date detailed below do not support more restrictive functional limitations than those assessed herein. At her initial evaluation, Dr. Mahajan observed the claimant was oriented person, place, and time, with intact recent and remote memory, normal attention span and concentration, and normal language testing for comprehension, repetition, expression, and naming (1F/9). The claimant's general fund of knowledge was intact (1F/9, dated March 17, 2022). The claimant's motor examination was normal and she had normal muscle bulk and tone in both upper extremities and lower extremities (1F/9). The claimant had full (5/5) strength in the distal and proximal muscles in both the upper extremities and lower extremities, and there were no fasciculations,

tremors, or other abnormal movements (1F/9). The claimant exhibited normal coordination and had intact finger-nose-finger testing in both upper extremities, with no evidence of dysmetria, dysdiadochokinesia (1F/9). The claimant had intact heel-to-shin movements in both lower extremities (1F/9). The claimant however demonstrated mild sensory ataxia (1F/9).

A magnetic resonance imaging (MRI) of the claimant's brain was normal (1F/11 and 10F/26-27, dated April 8, 2022). The claimant also had a normal electroencephalography (EEG) (1F/11; 5F/11; and 10F/25-26, dated April 8, 2022). [Dr. Mahajan] increased Keppra dosage to 1000 milligrams, twice a day and added Topamax for migraine prophylaxis (1F/14). She had three breakthrough events (1F/14). Dr. Mahajan noted in May 2022, the claimant had no difficulty following single step commands, though she was mildly repetitive, tangential, and inattentive (10F/15). She was friendly and socially appropriate (10F/15). There were no involuntary movements observed and the claimant was able to touch her nose smoothly without dysmetria. The claimant's rapid alternating ha[n]d movements and heel to shin movements were normal (10F/15). Her gait was stable (10F/15).

The claimant has[] a severe seizure disorder, but the claimant's treatment seeking behavior and the level of treatment provided are not consistent with a disabling seizure disorder. The record indicates the claimant's symptoms have been conservatively managed with medication therapy. In June 2022, Dr. Mahajan noted had they had been progressively up-titrating the claimant to 2000 milligrams of Keppra a day in addition to Topamax 50 milligrams twice a day, though the claimant reported having passing out events (10F/ 217). At that time, it was not clear whether these events were epileptic or non-epileptic in nature (10F/17). Dr. Mahajan stated that her cognitive changes may be from concussive problems, medications, or uncontrolled seizures. Dr. Mahajan recommended the claimant undergo a[n] epilepsy monitoring unit study to help determine the nature of her episodes. Upon examination, the claimant's memory, focus, organization, and attention were quite diminished and she was experiencing some unusual ideas, like she felt she could feel electricity in the air (10F/17). Dr. Mahajan noted that the claimant had trouble sorting out information between historical information and difficulty differentiating between the Epilepsy Monitoring unit stay versus the sleep study stay; however, the claimant was able to follow single step commands without any difficulty (10F/17). Dr. Mahajan reported there were additional challenges as the claimant refused to be admitted to the hospital (10F/17). Dr. Mahajan hoped to reduce her medications particularly the lack of responsiveness to the antiepileptic medications (10F/20).

4

At her follow-up appointment in July 2022, the claimant [had] only been taking Vimpat at bedtime, and therefore Dr. Mahajan recommended that she stop taking Vimpat. Dr. Mahajan noted the claimant was able to convey information with a little better focus as compared to previous examination and she continued to follow single step commands without any difficulty (10F/22). At that time, most of the claimant's events were unwitnessed (10F/23). Dr. Mahajan had scheduled the claimant for epilepsy monitoring at the Cleveland Clinic on July 11, 2022 (10F/17). She noted that until there was proper long-term epilepsy monitoring, the claimant would remain on Keppra 2000 milligrams a day, twice a day and Topamax 50 milligrams a day (10F/23).

However, the claimant did not go to the epilepsy monitoring study (6F/13). Further the claimant transitioned treatment from Dr. Mahajan to Dr. Benedict's practice when she moved (6F).

. . .

[I]n August 2022, the claimant had an ambulatory EEG, which was negative for 77 hours (6F/13). The claimant had completed an event diary for review, which reported several episodes of seizure and tremors (6F/18). During this test, the claimant reported having an odd event in which she felt funny, was shaking, but she was conscious (6F/13). This event was reportedly similar to her other events (6F/13). However, there were no abnormal EEG findings to corollate the claimant's events (6F/18). The claimant did not have any true loss of consciousness events, and there were no spikes or sharp waves to suggest nidus for seizure (6F/13). There was no epileptiform activity recorded during this period (6F/18). There were no abnormal slowing or seizures record during this period, though the claimant reported several events which had no abnormal EEG corollate (6F/18).

Her treatment remained routine and conservative in nature, as chronicled in her treatment records, emergency room visits, and diagnostic testing reports (Exhibits 3F/1, 8F/4 and 15, 9F/66, 11F/2). In addition to her medication therapy, Dr. Danner recommended lifestyle and dietary changes to help treat her symptoms. Specifically, Dr. Danner had suspected the claimant's events were hypotensive in nature and the claimant was not intaking enough calories nor protein (6F/13. dated September 28, 2022). The claimant reported eating a vegan and vegetarian type diet and was likely not drinking enough fluids (6F/13). The claimant had a hard time keeping weight on and her BMI was only 18 (6F/13). Dr. Danner counseled the claimant to[] increase[] her fluid and salt intake to increase her blood pressure and monitor her blood pressure (6F/13). She also recommended the claimant follow seizure precautions including no driving, no tub bathing, swimming alone, operating heavy machinery or working at

heights, or watching or bathing small children (6F/13).

Kelley Wheatley, C.N.P., observed the claimant was cooperative, able to rise from the waiting room chair independently, sat comfortably during examination, and was able to take off her shoes and socks without assistance (4F/2, dated July 24, 2022). She had intact finger-to-nose and heel-to-shin testing (4F/3). She ambulated with non-antalgic gait and did not walk with an assistive device (4F/3). She was able to walk on her toes and heels, as well as tandem gait (4F/3). The claimant had intact Romberg testing (4F/3). She was able to sequentially touch each finger to thumb without difficulty and make a fist without difficulty (4F5).

Wes J. Holliday, D.O., a cardiologist, observed in August 2022, the claimant had normal heart rate, normal S1 and S2 heart sounds, with no murmurs, rubs, clicks or gallops (9F/3). The claimant's EKG showed normal sinus rhythm, with nonspecfiic ST and T wave changes (9F/3). He recommended the claimant follow a cardiac diet with low fat, cholesterol, calories, and sodium (9F/4).

The claimant's symptoms have been managed with Topamax and a low-dose of Keppra, which the claimant tolerated well (8F/3, dated January 9, 2023). The claimant's symptoms have been treated conservatively with lifestyle changes, such as increased . . . salt and fluid intake when her blood pressure is low (8F/3). The claimant keeps salt packets with her and will take them when she has the feeling that a spell is coming (8F/3). The claimant also had changed her diet and was doing better with protein sources (8F/5).

The claimant has not passed out or had any loss of consciousness (8F/3). Her significant other stated that she had not had any episodes in a long time (8F/3). Physical examinations at that time showed that the claimant was cooperative, in no acute distress. She had intact sensation to light touch, pin prick, normal finger-to-nose, normal rapid alternating movements, normal gait, and negative Romberg signs (8F/4). Dr. Danner did not think the claimant needed a higher dose of Keppra and planned to wean the claimant down by 500 milligrams every two weeks until she was off Ke[p]p[r]a. Dr. Danner felt that the claimant should remain on seizure precautions during this timeframe (8F/5, dated January 8, 2023). She noted that if the claimant continued to have events, she planned to increase the claimant's Topamax dosage, but wanted to watch for weight loss. The claimant was cooperative, in no acute distress, and grossly oriented person, place, and time, with normal attention and concentration, intact language skills, below average memory, and below average fund of knowledge (8F/3, dated January 8, 2023). The claimant continues to be under medication management, though symptoms have been stable.

6

(ECF No. 7, PageID #: 68–72).

### C. Opinion Evidence at Issue

On July 24, 2022, Kelley Wheatley, a certified nurse practitioner ("CNP"), examined Ms. West at the request of the Social Security Administration and completed a "medical consultant report" detailing her observations from the evaluation. (ECF No. 7, Page ID #: 74, 487). Wheatley detailed West's history of present illness, explaining her reported history of seizures and anxiety, detailed her ability to perform activities of daily living, reviewed West's subjective reports of symptoms, and completed a physical exam. (ECF No. 7, Page ID #: 487–92). As part of her physical exam, Wheatly conducted coordination tests and a strength exam, assessed West's gait, reflexes, and range of motion, and conducted a joint examination. These tests yielded normal results. (ECF No. 7, Page ID #: 489–91). Wheatley diagnosed West with epilepsy, anxiety, and migraines. (ECF No. 7, Page ID #: 491). She also provided a "functional assessment and medical source statement" assessing whether West could perform certain work-related activities, and if she could, to what level. (ECF No. 7, Page ID #: 491–92). Wheatley found West could only occasionally lift up to ten pounds, could only occasionally carry up to ten pounds, could sit, stand, or walk less than two hours per day, could only occasionally reach, handle, feel, and grasp with her right and left hands, and could only occasionally bend, stoop, kneel, or squat. (ECF No. 7, PageID #: 491–92). The ALJ did not find this opinion persuasive. (ECF No. 7, PageID #: 74). West challenges the ALJ's evaluation of this opinion.

### IV.   The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

> 5. After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to

perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following limitations: frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and frequently balance, stoop, kneel, crouch, and crawl. She can do work that does not require binocular vision (meaning work that can be performed with a patch on one eye); but can never be exposed to hazards such as moving machinery, nonprotected heights, or commercial driving.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2022, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(ECF No. 7, PageID #: 68, 75–76).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535,

538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

## C. Discussion

West raises one issue on appeal. She argues that the ALJ's RFC is not supported by substantial evidence because the ALJ failed to properly evaluate CNP Wheatley's opinions within her "medical consultant report" according to the appropriate regulations for evaluating

medical opinion evidence. (ECF No. 8 at 8, 13). At step four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). On January 18, 2017, the Social Security Administration amended the rules for evaluating medical opinions for claims filed after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." C.F.R. § 404.1520c(a). Nevertheless, an ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. 20 C.F.R. § 404.1520c(a). In doing so, the ALJ is required to explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). Medical source opinions are evaluated using the factors listed in 20 C.F.R. § 404.1520c(c). The factors include: supportability; consistency; the source's relationship with the claimant; the source's specialized area of practice, if any; and "other factors that tend to support or contradict a medical opinion." 20 C.F.R. §§ 404.1520c(c), 404.1520c(b)(2) ("The factors of supportability [ ] and consistency [ ] are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions . . . . ").

CNP Wheatley examined West at the request of the Social Security Administration and completed a "medical consultant report" detailing her findings and observations. (ECF No. 7, Page ID #: 487–93). Wheatley recounted West's history of present illness, including her reported history of seizures and anxiety, noted her ability to perform activities of daily living, noted her subjective reports of symptoms, and completed a physical exam. (ECF No. 7, Page ID #: 487–

92). Wheatley diagnosed West with epilepsy, anxiety, and migraines. (ECF No. 7, Page ID #: 491). She also completed a "functional assessment and medical source statement" assessing whether West could perform certain work-related activities. (ECF No. 7, Page ID #: 491–92). Despite Wheatley's findings that West performed well in her coordination tests and strength exam, and had normal gait, reflexes, range of motion, and no deformity, tenderness, or swelling in her joints, Wheatley indicated that West's ability to complete work activities was limited in several ways. (ECF No. 7, PageID #: 489–92). Wheatly found that West could only occasionally lift up to ten pounds, could only occasionally carry up to ten pounds, could sit, stand, or walk less than two hours per day, could only occasionally reach, handle, feel, and grasp with her right and left hands, and could only occasionally bend, stoop, kneel, or squat. (ECF No. 7, PageID #: 491–92).

The ALJ found CNP Wheatley's opinion unpersuasive, reasoning:

> Ms. Wheatley's assessment is not persuasive. She concluded the claimant could never lift or carry more than 11 pounds, could occasionally lift, sit, stand, and walk less than 2 hours in an 8-hour workday, occasionally reach, handle, feel, and grasp, bend, stoop, kneel, and squat (4F). Her conclusions are not consistent with her own observation that the claimant had no abnormal range of motion for her spine, hands, hips, shoulders, elbow, knee, ankles, feet and wrist, and no deformity or swelling of her joints (4F/3-4). It is not consistent with her observations that the claimant was able to sequentially touch each finger to her thumb without difficulty, make a fist without difficulty (4F/4-5). The claimant had full (5/5) strength and normal sensation. While [] Wheatley may have considered the claimant's subjective complaints of weakness and possible balance issues, her assessment appears to be an overestimate of the claimant's limitations. [] The less restrictive residual functional capacity at the light exertional level considers the claimant's impairment-related symptoms in combination, and is supported by the claimant's treatment history, medication use, and activities of daily living.

(ECF No. 7, PageID #: 74).

11

West argues that the ALJ "neglected to address the mandatory factors [for evaluating a medical opinion] required by 20 C.F.R. § 404.1520c." (ECF No. 8 at 8). "More specifically," West asserts, "the ALJ failed to compare expert Wheatley's opinions to the rest of the record." (ECF No. 8 at 8).[1] West further argues that the ALJ's error was not harmless, for if the ALJ adequately accounted for Wheatley's opinions, she would have had to find that West was disabled, "as she would have been unable to sustain the physical requirements of full-time competitive employment." (ECF No. 8 at 9). The Commissioner argues that "the ALJ adequately considered both [the supportability and consistency] factors with regard to Ms. Wheatley's opinion" and that both the ALJ's finding CNP Wheatley's opinion unpersuasive and the ALJ's "broader RFC determination" are supported by substantial evidence. (ECF No. 10 at 5–6).

In regard to the supportability requirement, West acknowledges that the ALJ "did specifically identify portions of expert Wheatley's report that were allegedly not supportive of her opined restrictions," but, she argues, "Wheatley's report as a whole did provide support for her findings." (ECF No. 8 at 10). West asserts that, during the examination, she told Wheatley that she suffered from a variety of symptoms including "unexplained weight loss, fatigue, weakness, chest pain, palpitations, abdominal pain, back pain, joint stiffness, numbness, tingling, headaches, dizziness, and anxiety" and additionally reported her history of seizures—telling Wheatley that her most recent seizure occurred the day before the examination and that her seizures occurred several times per week and lasted about thirty minutes. (ECF No. 8 at 10). West argues that rather than focus on these symptoms in her supportability analysis, the ALJ

---

[1]     While this argument leads one to believe West challenges only the ALJ's consistency analysis, it is clear to the undersigned, and West argues later in her brief, that she also alleges that the ALJ's supportability analysis was inadequate, too.

12

instead focused on Wheatley's strength and range of motion findings, which in West's view, were "objective findings that would have been related to physical impairments related to musculoskeletal disorders[,]" which were not the issues she presented with. (ECF No. 8 at 11). According to West, it would not be abnormal, based on her impairments, for a "physical examination to document normal strength and sensation or normal range of motion," and by focusing on these portions of Wheatley's report, the ALJ "erroneously" focused on findings "irrelevant" to the severity of her impairments. (ECF No. 8 at 11).

The Commissioner asserts that West agrees that the ALJ identified portions of Wheatley's report that were allegedly not supportive of the restrictions she indicated West had, thus, she considered supportability although she did not use the term. (ECF No. 10 at 9). The Commissioner also asserts that the ALJ explained that Wheatley's "benign physical examination did not provide sufficient support for the strict physical limitations she had suggested in her opinion" and explains that this is "consistent with the regulations describing the supportability analysis, which 'evaluates how well "the objective medical evidence and supporting explanations presented by a medical source" support a medical opinion.'" (ECF No. 10 at 9) (quoting *Sallaz v. Comm'r of Soc. Sec.*, No. 23-3825, 2024 WL 2955645, at *5 (6th Cir. June 12, 2024) (quoting 20 C.F.R. § 404.1520c(c)(1))). Further, the Commissioner argues that despite West's allegation that the ALJ overlooked the several non-exertional symptoms that West reported to Wheatley, and that Wheatley recorded in her "current medical history" section, the ALJ in fact considered these symptoms in her supportability analysis evidenced by her writing "Ms. Wheatley may have considered the claimant's subjective complaints of weakness and possible balance issues." (ECF No. 10 at 9). But, the Commissioner further explains, even after recognizing that Wheatley may have considered West's subjective complaints of strength or

balance-related symptoms, the ALJ determined that Ms. Wheatley's assessment appeared to be an "overestimate" of West's limitations. (ECF No. 10 at 9–10). Thus, the Commissioner argues, the ALJ anticipated West's argument that the other symptoms led to the strict limitations, weighed the evidence, and shut down that argument, as is the ALJ's prerogative. (ECF No. 10 at 10). The Commissioner finally asserts that West is merely pointing to conflicting evidence— here her subjective complaints recorded in the medical history—and asking for this Court to reach a different result than the ALJ, but, the Commissioner argues, such attempt to point to conflict is unavailing, as the ALJ's finding Wheatley's report unsupported was supported by substantial evidence, therefore, the Court must accept it. (ECF No. 10 at 10).

The Court agrees with the Commissioner. The ALJ adequately considered the supportability of CNP Wheatley's opinion. As an initial matter, the ALJ stated that CNP Wheatley's findings that West had several functional limitations—including that she "could never lift or carry more than 11 pounds, could occasionally lift, sit, stand, and walk less than 2 hours in an 8-hour workday, occasionally reach, handle, feel, and grasp, bend, stoop, kneel, and squat"—were inconsistent with her own observations made in the "physical examination" section of her report. (ECF No. 7, PageID #: 74). Specifically, the ALJ stated that Wheatley's conclusions were inconsistent with her findings that West had "no abnormal range of motion for her spine, hands, hips, shoulders, elbow, knee, ankles, feet and wrist, and no deformity or swelling of her joints,"  that West could "sequentially touch each finger to her thumb without difficulty [and] make a fist without difficulty," and that West "had full (5/5) strength and normal sensation." (ECF No. 7, PageID #: 74). The results of the various physical tests that CNP Wheatley performed to evaluate West's strength, range of motion, joints, etc., the same findings that West simultaneously calls "objective findings" related to physical impairments and

14

"irrelevant" to the severity of West's limitations identified by CNP Wheatley—limitations that are clearly are related to West's physical capabilities—are precisely the type of "objective medical evidence" to which the regulation defining supportability refers.[2] Thus, the ALJ's consideration of these objective findings was appropriate, despite West's claims that such tests were irrelevant to her impairments.

Further, as the Commissioner asserts, the ALJ did not simply ignore West's subjective reports of symptoms that were recorded in Wheatley's report under the "History of Present Illness" and "Systems Review" sections. Rather, as the Commissioner explained, the ALJ clearly considered these self-reported symptoms in finding Wheatley's opinion unpersuasive, as she wrote, "While [] Wheatley may have considered the claimant's subjective complaints of weakness and possible balance issues, her assessment appears to be an overestimate of the claimant's limitations." (ECF No. 7, PageID #: 74). This line illustrates that not only did the ALJ consider West's subjective reports of other symptoms, including weakness and balance issues, but she found them to be incredible, as is within her powers as an ALJ. *See Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 863 (6th Cir. 2011) ("The ALJ, of course, and not the

---

[2]     20 C.F.R. § 404.1520c(c)(1) provides the following guidance for an ALJ assessing a medical opinion for supportability: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical findings(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

"Objective medical evidence is medical signs, laboratory findings, or both, as defined in §404.1502(f)." 20 C.F.R. § 404.1513(a)(1). "*Signs* means one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques." 20 C.F.R. § 404.1502(g). "*Laboratory findings* means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques. Diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." 20 C.F.R. § 404.1502(c).

reviewing court, is tasked with evaluating the credibility of witnesses, including that of the claimant."). Though West accurately claims that Wheatley's notes of her subjective symptoms support Wheatley's findings that West has functional limitations related to lifting, walking, sitting, standing, and postural and manipulative activities, the Commissioner, too, accurately argues that an ALJ may weigh the incompatible evidence and make a decision, and so long as that decision is supported by substantial evidence, a reviewing court may not disturb it. *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017) (citing *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990) ("The [Commissioner], and not the court, is charged with the duty to weigh the evidence, to resolve material conflicts in the testimony, and to determine the case accordingly.")); *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854–55 (6th Cir. 2010) ("Even if this Court might have reached a contrary conclusion of fact, the Commissioner's decision must be affirmed so long as it is supported by substantial evidence.").

Here, by discussing the objective medical findings that were incompatible with CNP Wheatley's functional limitation findings and acknowledging that CNP Wheatly may have considered West's subjective complaints of weakness, possibly causing her to err in her findings, the ALJ adequately considered the supportability of Wheatley's report. There is substantial evidence to support the ALJ's conclusion that CNP Wheatley's opinion was unsupported, and, thus, the undersigned finds no error with this conclusion.

Regarding the consistency factor, West asserts that the ALJ "failed entirely to compare [CNP] Wheatley's opinion to the rest of the record." (ECF No. 8 at 10). She argues that the ALJ "did not even cite to another exhibit when evaluating expert Wheatley's opinions" and "failed to identify a single piece of evidence that was supposedly inconsistent with Wheatley's report" and, thus, failed to meet 20 C.F.R. § 404.1520c's consistency analysis requirements. (ECF No. 8

16

at 11).  West explains that the ALJ's failure to conduct a consistency analysis is important because evidence exists in the record that is consistent with Wheatley's opinion—namely records from Dr. Mahajan, a neurologist who treated West, that note that West reported seizure activity, that Dr. Mahajan diagnosed West with idiopathic epilepsy and prescribed her seizure medication, and that West suffered from cognitive changes that would prevent her from being able to perform in the workplace. (ECF No. 8 at 12). The ALJ, West claims, failed to do a consistency analysis and instead focused on findings that were "completely irrelevant" to West's severe impairments. (ECF No. 8 at 12).

The Commissioner argues that the ALJ adequately considered the consistency factor before finding that Wheatley's opinion was not persuasive and that such finding was supported by substantial evidence. The Commissioner explains that the ALJ recognized that West had witnessed seizures in March 2022 and that her neurologist, Dr. Mahajan, noted concerns about West's signs of mental confusion and ongoing unwitnessed seizures, but she also "cited evidence suggesting that the seizures were not as limiting as [West] claimed." (ECF No. 10 at 6). For example, the ALJ cited to the fact that West never underwent inpatient assessment of her seizure events, despite Dr. Mahajan's advice to do so, that her portable 77-hour EEG results were completely normal, even in periods during which West asserted she suffered seizure-like events, that West's other EEG and MRI studies were normal, that Dr. Danner, another of West's neurologists, believed the seizures were actually related to low blood pressure and poor nutrition, that "lifestyle and dietary changes" helped with West's symptoms, and that she did not report seizure-like events to Dr. Danner. (ECF No. 10 at 6). The Commissioner argues that a "commonsense reading" of the ALJ's decision shows that these findings supported the ALJ's analysis of Wheatley's opinion. (ECF No. 10 at 7).

17

Further, the Commissioner argues that while the ALJ did not use the words "consistency" in her analysis, she did compare Wheatley's opinion to other evidence in the record when she explained that the RFC she assigned was less limited than the restrictions that CNP Wheatley suggested and was supported by West's "treatment history, medication use, and activities of daily living." (ECF No. 10 at 8). The Commissioner explains that an ALJ need not use the word "consistency" in her analysis and that her discussion need not be lengthy so long as she makes the required findings. (ECF No. 10 at 8).  Further, the Commissioner argues, courts have affirmed that ALJs are entitled to allude to their earlier discussion of evidence inconsistent with the medical opinion when evaluating the medical opinion's persuasiveness. (ECF No. 10 at 8). Finally, the Commissioner asserts that each of the factors cited by the ALJ as reasons that she gave an RFC lesser in limitations than those suggested by Wheatly "were such that a reasonable mind could believe them inconsistent with Wheatley's opinion." (ECF No. 10 at 8). West's treatment history showed no objective evidence of seizures, nor any issues with mobility or strength, West's symptoms seemed to improve with medication and conservative measures to manage her blood pressure and nutrition, and West described normal activities of daily living with no clear limitations like those severe physical limitations suggested by Wheatley's opinion. (ECF No. 10 at 8–9).

The undersigned agrees with the Commissioner and finds that the ALJ adequately considered the consistency of CNP Wheatley's opinion with the record evidence. As an initial matter, the ALJ explained that the RFC that she found applicable for West, which was less restrictive than that limitations CNP Wheatley suggested in her report, is supported by West's treatment history, medication use, and activities of daily living. (ECF No. 7, PageID #: 74). While the ALJ did not use the word "consistent," ALJs need not use any "magic words" when

evaluating the supportability and consistency of a medical opinion. *Guthrie v. Comm'r of Soc. Sec.*, No. 3:22 CV 1309, 2024 WL 1466867, at *2 (N.D. Ohio Apr. 4, 2024) ("Courts have frequently held the ALJ is not required to use the word "supportability" or "consistency" in order to properly make findings as to those factors."). *See also Garland v. Ming Dai*, 593 U.S. 357, 369 (2021) (finding that an agency need not "follow a particular formula or incant 'magic words'" for its decision to be upheld by a reviewing court). And still, the ALJ suggested that record evidence, consisting of West's treatment history, medication use, and activities of daily living, was more consistent with her RFC than the limitations suggested in CNP Wheatley's opinion, thus suggesting these portions of the record evidence were inconsistent with Wheatley's more restrictive findings. Further, while the ALJ did not elaborate on how these three factors were inconsistent with Wheatley's findings in the paragraph in which she assessed the persuasiveness of Wheatley's opinion, as the Commissioner argues, the ALJ did address this record evidence earlier in her decision and was not required to repeat that discussion in the paragraph finding Wheatley's opinion unpersuasive. *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (finding that the ALJ's evaluating a medical opinion by summarizing and referencing earlier discussion of the pertinent medical records was acceptable); *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 455 (6th Cir. 2016) (finding "reversal was not warranted because the ALJ's conclusion was sufficiently supported by factual findings elsewhere in the decision that need not be repeated").

When discussing West's RFC, the ALJ discussed West's treatment history, medication use, and activities of daily living. She discussed evidence from several treatment records that was inconsistent with Wheatley's functional assessment, which found that West could lift only up to ten pounds occasionally, could sit, stand, or walk for only two hours in an eight-hour

workday, could stoop, kneel, bend, or squat only occasionally, and could feel, grasp, handle, or reach only occasionally. (*See* ECF No. 7, PageID #: 491–92). For instance, the ALJ found that "[t]he positive objective clinical and diagnostic findings since the alleged onset date . . . do not support more restrictive functional limitations than those assessed herein" and supported this finding by citing to Dr. Mahajan's treatment notes from West's March 2022 visit which noted:

> [C]laimant's motor examination was normal and she had normal muscle bulk and tone in both upper extremities and lower extremities (1F/9). The claimant had full (5/5) strength in the distal and proximal muscles in both the upper extremities and lower extremities, and there were no fasciculations, tremors, or other abnormal movements (1F/9). The claimant exhibited normal coordination and had intact finger-nose-finger testing in both upper extremities, with no evidence of dysmetria, dysdiadochokinesia(1F/9). The claimant had intact heel-to-shin movements in both lower extremities (1F/9). The claimant however demonstrated mild sensory ataxia (1F/9).

(ECF No. 7, PageID # 69–70).

The ALJ further cited to West's normal MRI and normal EEG results detailed in Dr. Mahajan's April 2022 treatment notes and to another normal physical examination from Dr. Mahajan's May 2022 treatment notes, explaining that Dr. Mahajan observed no involuntary movements, that West was able to touch her nose smoothly and without dysmetria, that her rapid alternating hand movements and heel-to-shin movements were normal, and that her gait was stable. (ECF No. 7, PageID #: 70). The ALJ further explained that the assertions West could not remain seated for six hours, stand and/or walk for approximately two hours, and could alternate sitting and standing only on scheduled breaks were not supported by the physical examinations noted in her treatment records from Dr. Mahajan, Dr. Danner, and CNP Wheatley. (ECF No. 7, PageID # 71).

Additionally, the ALJ discussed the fact that while West has a severe seizure disorder, the level of treatment provided was not consistent with a *disabling* seizure disorder and "[t]he record indicates [West]'s symptoms have been conservatively managed with medication therapy." (ECF No. 7, PageID #: 70). The ALJ noted that Dr. Mahajan was "progressively up-titrating" West to 2000 milligrams of Keppra, an anti-epileptic drug, per day and prescribed 50 milligrams of Topamax, a migraine drug, to be taken twice daily. (ECF No. 7, PageID #: 70). She also noted that Dr. Mahajan advised West to continue taking these medications until after she completed proper long-term epilepsy monitoring but did recommend that West stop taking Vimpat, another anti-epileptic drug, in July 2022, as she was only taking it before bed. (ECF No. 7, PageID #: 70). The ALJ explained that after West underwent a 77-hour EEG, with normal results and showing no seizure activity, West's new doctor, who suspected West's events were in fact hypotensive in nature, recommended West make lifestyle changes to increase her calorie intake and raise her blood pressure and added these suggestions to West's medication therapies. (ECF No. 7, PageID #: 71). The ALJ explained later in her decision that West's symptoms have been managed by Topamax and a low dose of Keppra and that Dr. Danner even suggested weaning West off Keppra in January 2023. (ECF No. 7, PageID #: 72).

Finally, the ALJ considered evidence of West's ability to complete activities of daily living, including the psychologist's report noting that West stated that she spends her day doing personal care tasks, performing household tasks, preparing food, and caring for a cat and children. (ECF No. 7, PageID # 72). The ALJ explains that West's participation in activities of daily living is consistent with the determination that she can work at her assigned RFC—at the light exertional level. (ECF No. 7, PageID # 72). The ALJ additionally considered the claimant's subjective indications that her seizure disorder limited her ability to lift, stand, reach, and walk

21

because her seizures made it more dangerous, but the ALJ found that the limitations at the light exertional level are more consistent with West's report that she could do household chores, prepare her own meals, and shop for food, cat food, and household items and is supported by her reports that she could clean, wash dishes, and vacuum. (ECF No. 7, PageID #: 73).

Thus, through her review of the evidence related to treatment history—including past neurologist treatment notes detailing normal physical strength and normal EEG and MRI results—medication use and other methods to conservatively treat West's symptoms, and West's ability to complete activities of daily living like cleaning, shopping, and caring for children, the ALJ adequately considered the consistency of CNP Wheatley's opinion.

West points to evidence in the record that she argues is consistent with CNP Wheatley's opinion—specifically that Dr. Mahajan, one of her treating neurologists, found she had idiopathic epilepsy and that she suffered from cognitive issues that would prohibit her from successfully performing in a workplace. (ECF No. 8 at 12).  First, it is unclear to the undersigned whether this evidence is even consistent with Wheatley's opinion. Wheatly did not suggest any limitations related to West's mental functioning and, rather, found West's mental functioning was normal, writing that she was "[a]lert and oriented," had "[n]ormal conversational speech," that her "[s]peech [wa]s fluent and comprehendible," that her mood and affect were appropriate, and that her "[t]hought processes [we]re linear and logical." (ECF No. 7, PageID #: 489). Thus, Dr. Mahajan's statements regarding West's cognitive changes seem at odds with, rather than consistent with, Wheatley's report.

But still, even if this evidence was consistent with Wheatley's opinion, as West asserts, this does not change the undersigned's analysis. For "a claimant does not establish a lack of substantial evidence by pointing to evidence of record that supports her position. Rather, [the

22

claimant] must demonstrate that there is not sufficient evidence in the record that would allow a reasoning mind to accept the ALJ's conclusion." *Greene ex rel. Green v. Astrue*, No. 1:10-cv-0414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010). Further, even if there were substantial evidence in the record that might also support West's position that Wheatley's opinion is consistent with the record, "it is not this Court's function to conduct a *de novo* review of the medical evidence and simply arrive at a different conclusion than the ALJ. Where there is sufficient evidence to support an ALJ's opinion, this Court must affirm." *Id.*

Here, the ALJ adequately considered the consistency of CNP Wheatley's opinion and explained how the opinion was inconsistent with the record. This conclusion was supported by substantial evidence. Therefore, the Court finds no reason to disturb this decision.

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE West's Statement of Error and AFFIRM the Commissioner's decision.

Dated: February 3, 2025

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530-31 (6th Cir. 2019).